**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re: | Case No. 23-16969-MMH |
| Roman Catholic Archbishop of Baltimore, | (Chapter 11) |
| Debtor. | |

| | |
|---|---|
| The Official Committee of Unsecured Creditors, | |
| v. | Adv. Proc. No. 26-00041-MMH |
| Roman Catholic Archbishop of Baltimore, | |
| Defendant. | |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, the Official Committee of Unsecured Creditors appointed in the above-captioned chapter 11 case (the "Committee") moves the Court (this "Motion") for an order granting a preliminary injunction against the debtor and debtor in possession, the Roman Catholic Archbishop of Baltimore (the "Debtor") and submits this Memorandum of Points and Authorities in support of the same. Specifically, the Committee seeks a preliminary injunction preventing the Debtor and all persons acting in concert with the Debtor from taking any further actions to implement any of the following of the Debtor's Seek the City objectives without prior Bankruptcy Court authorization following notice and a hearing:

6541747.1

1

I.      closing, suppressing, merging, consolidating, or materially reorganizing any parish within the Archdiocese of Baltimore;

II.     selling, leasing, transferring, encumbering, or otherwise disposing of any real property or other material assets of any parish that is the subject of Seek the City, or authorizing any such disposition;

III.    distributing, transferring, disbursing, pledging, commingling, or otherwise using proceeds of any Seek the City related asset dispositions;

IV.     implementing, enforcing, or amending any Seek the City-related policy that governs the disposition of assets or liabilities, or materially impacts revenues derived from parishes; and/or

V.      taking any action that would frustrate, moot, or impair this Court's ability to grant effective relief concerning Seek the City, including accelerating transactions or altering governance or financial arrangements.

The relief sought by the Committee in the Motion is necessary to ensure that the Debtor's conduct in connection with its reorganizational efforts concerning its parishes—over which it exerts actual and constructive control; which constitute its primary organizational funding mechanism; and which it now contends will obtain relief from Survivor claims against them as the result of the Debtor's reorganization in this case—is subject to Bankruptcy Court oversight during the pendency of this case.

6541747.1

2

## **FACTUAL BACKGROUND**

The Debtor exerts actual and constructive control over the operations and finances of its parishes. (*See* Exh. F, Parker Trans., 57:5-58:13.)

The operations of each parish are governed by a Board of Corporators, which consists of (i) the Roman Catholic Archbishop of Baltimore, (ii) the Vicar General of the Archdiocese of Baltimore, (iii) the pastor or administrator of the parish, and (iv & v) two adult laymen living within the geographic territory of the parish appointed by the Archbishop, govern the business operations of each parish. (*See* Exh. G, "Parish Corporators" webpage; *see also, e.g.,* Exh. H, "A Moment with Msgr. Woy", St. Francis de Sales Roman Catholic Church.) The Vicar General is an employee of the Debtor, as is the pastor or administrator of each parish. (*See* Exh. F, Parker Trans., 22:5-11; 58:6-13.) The Debtor has sole authority to appoint and remove the Vicar General and the pastor and/or administrator of each parish. (*See* Exh. F, Parker Trans., 22:5-11; 58:6-13.)

The Debtor's "primary cash inflow" consists of the levies it imposes on the parishes and other Catholic entities within the Archdiocese of Baltimore. (Exh. E, Matera Trans., 32:18-33:13.) More than half of the Debtor's budget for its core services comes from a levy known as the Cathedraticum, which is a mandatory assessment paid by parishes based on portions of each parish's revenues. (Exh. E, Matera Trans., 32:18-33:13, 34:20-35:10; Exh. L, Report on Allocation and Use of Cathedraticum, slide 5 (identifying Cathedraticum as comprising 52% of the Debtor's "FY26 Core Services Budget").) The establishment of the amounts due under the Cathedraticum are not subject to oversight by advisory boards like the Debtor's Board of Financial Administration and are instead unilaterally imposed on parishes by the Debtor. (Exh. E, Matera Trans., 68:20-69:1, 69:21-70:12.) In addition to the Cathedraticum, the Debtor taxes the purchase, lease, and/or

sale of parish property, collecting 5% of the transaction price as a fee. (Exh. I, "201 Sale of Property", at 201.8.)

At the time the Debtor filed its voluntary petition for relief, there were 153 parishes within the Archdiocese of Baltimore, in addition to other schools, non-profit entities, funds, and trusts. (Exh. J, City News, May 23, 2024.) On or around May 22, 2024, the Debtor publicized that, pursuant to its "Seek the City to Come" initiative, the Debtor would begin closing, realigning, and merging approximately 61 of the 153 parishes located in Baltimore City and its surrounding suburbs ("Seek the City"). (Exh. B, Archbishop Lori's Message on Seek the City Final Plan; Exh. J, City News, May 23, 2024.) The Debtor made the decision to close, merge, and reorganize parishes. (Exh. A, Debtor's Seek the City webpage, "Archbishop William E. Lori came to the decision after careful review and deliberate consideration…".) The Debtor began implementing Seek the City in or around December 1, 2024. (*See* Exh. K, Catholic Review, November 4, 2024.) These policies propose the disposition of assets and liabilities throughout the Archdiocese of Baltimore, including the sale of certain of real property. (Exh. B, "New investment in ministries and buildings will follow and careful consideration will be given to any church property that will eventually be sold to ensure responsible reuse for the community and our neighbors.")

Parishioners have expressed their displeasure with the closing of the various parishes, and those associated with at least one parish has appealed to the Vatican concerning the effect of Seek the City. (Exh. C, "Archdiocese of Baltimore 'refusing' to reopen parish after Vatican order, advocates say", The Catholic World Report, May 20, 2025.) Other parishioners have objected to the particulars of the mergers, objecting to matters including ideological differences between combined parishes and the prospect of losing constituents. (Exh. D, "Two historic Catholic

6541747.1

churches in Baltimore are merging. Parishioners are holding their breath.", The Baltimore Banner, June 28, 2025.)

The Debtor has not sought approval from the United States Bankruptcy Court for the District of Maryland concerning the decision to implement or the follow-on effects of Seek the City, including the disposition of millions of dollars in assets and liabilities. Instead, the Debtor unilaterally decided these assets will not go to benefit this chapter 11 process and, in public-facing messages, proclaimed that the "future sales of properties" will not support any settlement in this bankruptcy case. (Exh. B.) On April 1, 2025, the Debtor and the Committee entered a stipulation concerning Seek the City whereby the Committee reserved all of its rights to take any civil action to challenge Seek the City or any transactions related to Seek the City. Then, on October 3, 2025, the Debtor filed a plan of reorganization which seeks third-party releases and injunctions benefiting its affiliated entities, including its parishes participating in Seek the City, from claims filed by Survivors in the Debtor's chapter 11 case. (Bankruptcy Case No. 23-16969 at Dkt. 14121.) Moreover, on the Debtor's own website, in a Frequently Asked Questions section, it states:

> Will proceeds from buildings being sold go to the Chapter 11 settlement?
>
> The parish is a separate entity from the Archdiocese. Therefore, whatever assets the parish own, stay with that parish or follow that parish when merged into a newly formed parish. All newly formed parishes will remain separate entities from the Archdiocese.

*See* https://www.archbalt.org/seek-the-city-newly-formed-parishes/ (last accessed March 17, 2026).

6541747.1

## ARGUMENT

Preliminary injunctions under Fed. R. Civ. P. 65[1] are intended to preserve the status quo and prevent irreparable harm during the pendency of litigation. *Asylum Seeker Advoc. Project v. United States Citizenship & Immigr. Servs.*, 808 F.Supp.3d 708, 715 (D. Md. 2025); *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 421 (D. Md. 2025). Plaintiffs seeking a preliminary injunction must establish: "(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).

"Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F.Supp.3d 822, 841–42 n. 6 (D. Md. 2025) (quoting *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F.Supp.3d 327, 352 (D. Md. 2021)). The Debtor must comply with the express requirements of the Bankruptcy Code and provide creditors with notice and a chance to be heard regarding Seek the City. For the reasons that follow, the Committee satisfies each of the four factors justifying its request for a preliminary injunction.

---

[1] Incorporated by reference in Fed. R. Bank. P. 7065. The Committee submits that it should not be required to comply with Fed. R. Civ. P. 65(c), because the Committee has no financial resources other than the resources of the Debtor's estate, and so payment of any bond would come from the Debtor's estate to pay the Debtor for purported damages, and thus serves no practical purpose. *Cruz Medina v. Noem*, 806 F. Supp. 3d 536, 553 (D. Md. 2025) (noting waiver of a bond is permitted provided the court consider the matter and issue findings justifying the waiver).

6541747.1

## I.     The Committee is Likely to Succeed on the Merits.

The Committee is more than likely to succeed on the merits of its claims. This adversary proceeding merely seeks to impose Bankruptcy Court oversight of the Debtor's extraordinary conduct in undertaking major operational and financial changes during the pendency of its bankruptcy proceedings. The Committee expects that there will be no material dispute as to any facts, as the Debtor's conduct in attempting to reorganize its parishes under the Seek the City initiative is open and notorious and a matter of public record. (*See, e.g.,* Exhs. A, B, C, D, J, K.) The Committee likewise expects that there will be no material dispute that the parishes are the primary funding source for the Debtor. (*See, e.g.,* Exh. E, Matera Trans., 32:18-33:13, 34:20-35:10; Exh. L, Report on Allocation and Use of Cathedraticum, slide 5.) The only question the Committee expects to be in dispute will be the legal question of whether or not this Court should have notice and oversight concerning the Debtor's conduct.

When the Debtor filed its chapter 11 bankruptcy case, it availed itself of 11 U.S.C § 101, *et seq.*, which includes 11 U.S.C. § 363(b). As this Court is no doubt familiar, § 363(b) states that the Debtor, "***after notice and a hearing***, may use, sell, or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b) (emphasis added).

To avoid court-oversight, a debtor must present evidence suggesting that the transaction at issue is "common practice" in the industry or one "a creditor could reasonably expect" the specific debtor would enter into in the ordinary course. *See In re Southeast Hotel Properties Ltd. P'ship*, 99 F.3d 151, 158 (4th Cir. 1996). In sum, "[a] transaction occurs in the debtor-in-possession's ordinary course of business when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business." *In re Springfield Contracting Corp.*, 154 B.R. 214, 226 (Bankr. E.D. Va. 1993) (context of § 549 claims).

Courts employ a two-step inquiry in determining what constitutes a transaction "in the ordinary course of business." *In re Fairmont Gen. Hosp., Inc.*, 510 B.R. 783, 787 (Bankr. N.D. W. Va. 2014). The first is a "horizontal dimension" test where the Court must consider "whether from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Id.* The second, a "vertical dimension" test, considers whether a creditor could reasonably expect a debtor to enter into that type of transaction relative to pre-petition expectations. *Id.*

The horizontal dimension test clearly resolves in the Committee's favor. It is not the Debtor's ordinary course of business to close or reorganize nearly a third of the parishes in its jurisdiction. As the Debtor's own publications concede, this decision has been undertaken following "two years" of engagement with "almost 6,000" people to formulate its plan moving forward. (Exh. B.) The Debtor hired professional consultants to advise on Seek the City. *See* Dkt. 1321-2 ("Ayers was retained by the Debtor to provide necessary and desired services in connection with the Debtor's Seek the City initiative."). The realignment contemplated in Seek the City has been described by Archbishop Lori as a "dramatic realignment of our Church footprint." (Exh. B.) The extraordinary nature of the proposed realignment is evident by the substantial reactions it has triggered from church constituents, including multiple appeals to the Vatican and public reports on concerns about constituent retention. (*See generally* Exhs. C, D.) The magnitude of the change is substantial enough for there to be "transition teams" evaluating the affected parishes. (*See* Exh. K.)

As a threshold matter, the vertical dimension test, which asks about creditor expectations at the time they transacted with the debtor, is a poor fit for involuntary creditors like the Survivors. The core inquiry associated with the vertical dimension test concerns creditors' expectations in

connection with the economic risk of a transaction relative to a hypothetical creditor's pre-petition expectations. *See, e.g., In re Fairmont*, 510 B.R. at 787.

Survivors do not view the Debtor and its parishes as distinguishable and would certainly not expect the Debtor to close parishes in order to isolate assets from creditors. Survivors are not in this case because they made an economic decision in connection with their dealings with the Debtor. Survivors are in this case because they placed their faith in an institution and that faith was violated horrendously by the conduct of the Archdiocese and its representatives over a period of decades. The economic analysis contemplated by the vertical dimension test does not track the creditor status of Survivors, and the Committee respectfully submits that requiring compliance with the vertical dimension test is inappropriate under these circumstances.

Nonetheless, even if the vertical dimension test did apply, the substantial reorganization and combination of dozens of parishes is not conduct that a creditor would ordinarily expect a debtor situated like this Debtor to undertake every day. The scale of the Seek the City is substantial, affecting the organizational structure, parish attendance, and financial health of more than one third of the Debtor's parishes. The Debtor's insistence that the results of its sweeping reorganization efforts for its affiliates would be insulated from the scrutiny of creditors in the Bankruptcy case also would not be something that even a conventionally economically-oriented creditor would anticipate, particularly where (as here) creditors also possess claims against those individual parish entities. (*See* Frequently Asked Questions, https://www.archbalt.org/seek-the-city-newly-formed-parishes/; *see also* Exh. B.) The Debtor's proposal that its parishes will enjoy bankruptcy relief from hundreds of Survivor claims as a result of its reorganization only further confirms that creditors could not expect the effects of closing these parishes would be insulated from the bankruptcy case. (*See* Bankruptcy Case No. 23-16969 at Dkt. 1412-1.) Under any

6541747.1

applicable test, the Seek the City initiatives fall outside the ordinary course of business for this Debtor (or a debtor similarly situated).

Because the Debtor's decision to implement Seek the City is by any definition an extraordinary action, the Debtor must submit to court-oversight. For these reasons, the Committee is likely to succeed in its request for the relief, and the court should issue the injunction.

## II.    The Committee is Likely to Suffer Irreparable Harm

The Committee's constituency will likely suffer irreparable injury from the Debtor's ongoing defiance of § 363(b)'s notice and a hearing requirement. Because the Debtor has failed to meet its statutory obligations, the Committee, and creditors more generally, cannot ascertain whether the Debtor's wide-spread restructuring of its revenue streams, i.e. the parishes, risks financial disaster to the estate, or if Seek the City risks alienating parishioners and thus compromising the Debtor's prospects of success post-bankruptcy. Moreover, the Debtor has emphasized that, in implementing Seek the City, it has taken purposeful steps to isolate parish assets from creditors in this bankruptcy case. The Committee's constituency has suffered these harms for more than a year, and will continue to suffer these harms unless the Court issues an injunction.

In proving that a party will suffer irreparable harm, the party must show that the harm is "'neither remote nor speculative, but actual and imminent.'" *Brightview Grp., LP v. Teeters*, 441 F.Supp.3d 115, 137 (D. Md. 2020) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992)). The Fourth Circuit has acknowledged that the kind of harm at issue is sufficient for issuance of a temporary injunction. In *United States ex rel. Taxpayers Against Fraud v. Singer Co.,* 889 F.2d 1327 (4th Cir.1989), the Fourth Circuit Court of Appeals allowed a preliminary injunction which required the defendant "to obtain court review and approval of non-

ordinary-course-of-business transactions to prevent [the defendant], without court awareness, from further liquidating or distributing its assets." *Id.* at 1328. Though technically this injury could be remediated by money damages later, *id.* at 1331-32, the court noted that such an injunction was appropriate when the defendant was "'insolvent'" and its assets were "'in danger of dissolution and depletion.'" *Id.* at 1330 (quoting *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 285 (1940)); *see Hughes Network Sys., Inc. v. InterDigital Commun. Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

By continuing Seek the City, the Debtor has deprived the Committee of notice and a hearing and thus caused a direct and ongoing injury to the Committee and its constituency. The Debtor's violations of § 363(b) risk the waste, sale, and depletion of the Debtor's assets, revenues, and goodwill without court oversight. Courts have long recognized that a debtor's failure to comply with § 363(b)'s notice and a hearing requirement is a serious offense to creditors and the integrity of the bankruptcy process:

> This Debtor thumbed its nose at § 363(b). There was no notice and a hearing. Judicial authorization was never obtained or even sought. Yet, the Debtor after its Chapter 11 filing continued a most extraordinary employment of its most valuable asset. The Debtor's customer base or list was being used by a newly created, related entity, V. Savino II. Furthermore, apart from the § 363(b) violations, unauthorized post-petition transfers of estate assets constitute grounds for appointment of a Chapter 11 trustee.

*In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989). There is no way to remedy the Debtor's disregard for § 363, preserve its estate, and protect the integrity of the chapter 11 process, other than with an order prohibiting its ongoing efforts.

Without vetting Seek the City through notice and a hearing, the Committee cannot determine the full impact Seek the City will have on the estate. (*See* Exh. L at slide 5; Exh. E, Matera Trans., at 32:18-33:13.) For example, the heated public controversy surrounding the Debtor's decision to close nearly a third of its parishes alone warrants relief under these

circumstances, particularly in light of the multiple reports of parishioner discontent and the potential impacts on the Debtor's revenue and assets available in this bankruptcy. (*See, e.g.,* Exhs. C, D.) The Committee is also aware of several pending real property sales for parishes that have closed and merged as part of Seek the City. For example, the parish and school buildings from St. Pius X[2] are currently listed for sale for $5.3 million. St. Pius X, KLNB, https://klnb.propertycapsule.com/p/retail-real-estate/Baltimore-MD-21212/stpiusx (last accessed March 18, 2026). This transaction is not noticed on the court's docket, the professionals are not employed by the estate, and the Debtor has failed to seek authority on this substantial sale of real property.

The Debtor has made the likelihood of irreparable injury to the Committee even more explicit than just the potential impact of the Debtor's cash-flow. The Debtor has actively represented to the Catholic community that it **will withhold any proceeds** associated with its Seek the City decisions from Survivors in this bankruptcy case, on the grounds that parishes are distinct corporate entities from the Debtor.[3] At the same time, the Debtor has unambiguously represented to this Court that it seeks to protect all parish assets by operation of its proposed bankruptcy plan of reorganization.[4] The net result is that the Debtor is undertaking extraordinary actions with a

---

[2] St. Piux X merged into the Cathedral of St. Mary Our Queen as part of Seek the City. Newly Formed Parishes, Archdiocese of Baltimore,  https://www.archbalt.org/seek-the-city-newly-formed-parishes/ (last accessed March 18, 2026).

[3] *See, e.g.,* Frequently Asked Questions, https://www.archbalt.org/seek-the-city-newly-formed-parishes/ (last accessed March 17, 2026); *see also* Exh. B. The parishes are apparently not distinct enough from the Debtor, however, to make an independent decision regarding their continued existence.

[4] *See, e.g.*, Debtor's Chapter 11 Plan of Reorganization, Case No. 23-16969-MMH, Dkt. 1412-1 (Oct. 3, 2025), at ¶¶ 1.1.138 (defining "Protected Party" to include Parishes); 1.1.24 (defining "Channeled Claim" to include claims asserted against any of the Protected Parties); 3.2.6, 3.2.7, 3.2.8, 3.2.9 (all liability of Protected Parties for Survivor Claims assumed fully by the Insurance Trust and not to be satisfied from any source other than the Insurance Trust or Survivor Compensation Trust); 13.3 (channeling injunction preventing prosecution of claims against Protected Parties).

6541747.1

direct impact on both its financial affairs and those of the parishes, and it is seeking to cloak that conduct from the bankruptcy court's oversight even as it has committed to the position that those entities will enjoy complete relief as the result of the plan proposed by the Debtor in this case.

The relief sought by the Committee thus seeks to square the Debtor's position in this case—namely, that parishes will necessarily gain protection as the result of any reorganization of the Debtor—with the Debtor's conduct in controlling the realignment and reorganization of those same parishes. Since the Debtor seeks to protect the parishes' assets as the result of the Debtor's bankruptcy, the Debtor's conduct in managing those same assets should be the subject of this Court's review.

Given the positions taken by the Debtor in public statements and in this bankruptcy case, it is neither remote nor speculative to conclude that the Debtor intends to shield any such transactions both from this Court's oversight and the assets available for a reorganization in this case. As a result, the Committee will suffer irreparable harm if the Debtor is allowed to follow through with the types of transactions contemplated by Seek the City absent notice and oversight in this case.

### III.    The Balance of Equities Favors the Committee

To issue a preliminary injunction, the Court must consider whether the balance of equities tips in the Committee's favor. *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017). The equities of this adversary proceeding clearly favor the Committee. On the one hand, the Debtor cannot complain about the injuries it might suffer from simply following the Bankruptcy Code, because it elected to incur those "harms" when it voluntarily filed its petition. On the other hand, creditors in this case face a real, extant, and ongoing threat to their financial recoveries and confidence in the bankruptcy process, brought about from the Debtor's disregard for the

6541747.1

Bankruptcy Code. Without an injunction, the Debtor will continue its attempt to isolate its assets, deprive creditors of substantial revenue streams, and permanently damage its ability to reorganize by compromising its relationship with its core Catholic constituencies. The balance of the equities tips strongly in favor of the Committee.

There is minimal, and perhaps zero, harm to the Debtor in enforcing bankruptcy court oversight to its Seek the City conduct. The Debtor voluntarily sought bankruptcy protection and so cannot now complain about the corresponding responsibilities that follow. The only real harm the Debtor faces is delay in implementing Seek the City. This delay can be fixed in approximately 21-days, by filing a motion to approve Seek the City in the chapter 11 case. But this would require the Debtor to justify, with evidence and testimony, why Seek the City benefits creditors and this chapter 11 process. This might harm the Debtor, for instance, if Seek the City does not fit these bankruptcy objectives and instead further other objectives, like isolating assets from creditors. Notice and a hearing would thus defeat this improper scheme. But the harm that results from following the requirements of the Bankruptcy Code cannot be a legitimate basis to avoid accountability. Moreover, the Debtor has already experienced these delays through its own internal processes, including those associated with the multiple instances of appeals by parishioners to the Vatican associated with the realignment conduct contemplated by Seek the City. (*See, e.g.,* Exhs. C, D.) The potential harm to the Debtor (even in a scenario where its conduct is entirely appropriate) is thus either commensurate with existing review processes concerning the same conduct or it would represent a nominal additional delay. There is no other articulable equity weighing *against* the relief requested by the Committee, because bankruptcy court oversight is not an inherently inequitable result, particularly for an entity like the Debtor that has sought voluntary protection under the Bankruptcy Code.

6541747.1

14

On the other hand, as described above, the Committee may suffer irreparable harm under either of at least three distinct scenarios.

**First**, the Debtor has overtly expressed incompatible objectives in its public-facing comments concerning Seek the City and in its representations to this Court concerning its position on the results of its successful reorganization under Chapter 11. The public-facing comments unambiguously assert that the Debtor will insulate proceeds from the Seek the City reorganization from the bankruptcy case. (*See, e.g.,* Frequently Asked Questions, https://www.archbalt.org/seek-the-city-newly-formed-parishes/; *see also* Exh. B.) But the advocacy position assumed by the Debtor is that its successful bankruptcy reorganization will result in the elimination of the parishes' liability for claims against the parishes. (*See supra* n. 2.) The Debtor cannot be permitted to use Seek the City to isolate parish assets from the bankruptcy case and also use the bankruptcy case to limit the liability of those same parishes. There must be notice and a hearing on Seek the City to ensure that these seemingly incompatible positions will not result in the obfuscation of information concerning assets otherwise available to satisfy the claims against the affected parishes.

**Second**, creditors must be allowed to scrutinize the Debtor's business case for why Seek the City will benefit the Debtor's estate and creditors. The Debtor has made a business altering decision to close, consolidate, and restructure its revenue centers. Parish levies make up more than over half of the Debtor's revenue stream, and so it follows that the Debtor likely cannot close one-third of those revenue centers without risking significant changes to the financial stability of the bankruptcy estate. As discussed above, it appears to the Committee that the Debtor's motivations are instead to benefit only parishes to the determinant of Survivors and other creditors. Without proper notice and a hearing, where the Debtor's analysis and motivations can be properly probed,

6541747.1

15

Survivors face actual and imminent harm that the Debtor's business will be compromised to the detriment of Survivors and to the sole benefit of the parishes.

**Third**, the Debtor's conduct in reorganizing under the Seek the City initiative has evidently caused controversy within the Debtor's constituents. (*See* Exhs. C, D.) This controversy directly impacts Survivors in that they have a vested interest in the Debtor's finances for so long as this case remains pending, and the Debtor has made it clear that it relies on its parishes and their constituents as its main financial engine supporting its operations. (*See, e.g.,* Exh. E, Matera Trans., 32:18-33:13, 34:20-35:10; Exh. L, Report on Allocation and Use of Cathedraticum, slide 5.). Seek the City has had the demonstrable effect of isolating the Debtor's main revenue source (parishioners), and potentially decreasing the Debtor's cash revenue and goodwill assets. Creditors in this case are entitled to hear the Debtor's business case for these extraordinary actions and allow the Court to decide whether they are an appropriate exercise of the Debtor's business judgment. Because Seek the City has the potential to isolate assets from Survivors, destabilize the Debtor's revenue structure, and lead to the estrangement of parishioners and other key constituency groups, the Committee will suffer irreparable harm if Seek the City is allowed to continue without Court oversight.

## IV.    An Injunction is in the Public Interest

The public's interest in disclosure and clarity on these matters is apparent in at least three respects. **First**, as described above, Congress has decided that the public has a vested interest in disclosure and clarity in bankruptcy cases. *See* 11 U.S.C. § 363(b). This is especially true with regard to Seek the City because the Debtor has expressed what appear to be fundamentally inconsistent objectives as between its segregation of proceeds of Seek the City and its intentions with respect to the scope of bankruptcy relief for the purportedly separate parish entities. Absent

6541747.1

bankruptcy court oversight, certain transactions or other issues surrounding the Seek the City proposal could become the subject of extended testimony or disputed issues at plan confirmation. Imposing preliminary injunctive relief at this time would be a more efficient use of resources and preserve the status quo required by Congress in enacting § 363(b). Congress expressly contemplated that bankruptcy court oversight of extraordinary business processes would enhance creditors' and the public's faith in the bankruptcy processes. Without proper, Congressionally-mandated transparency throughout this chapter 11 process, the Committee does not believe the Debtor can gain creditor support to successfully reorganize. *See* 11 U.S.C. § 1129(a)(2),(3) (requiring the plan proponent and plan to comply with applicable provisions of the Bankruptcy Code).

**Second**, the Debtor's constituents (parishioners) have already manifested complaints concerning the lack of transparency with the Debtor's conduct. (*See* Exh. D, "They have been infuriatingly uncommunicative about why they chose what parishes they chose to close," said [Ms.] Daly. "As a very progressive parish, we felt that the progressive parishes were being targeted."). Additional public disclosure on transactions surrounding the Seek the City initiative would inure to the general benefit of the Debtor, its constituents, and by extension Survivors who have a financial stake in ensuring Seek the City does not compromise the Debtor's future cash flow and overall goodwill.

**Third**, the purposes of § 363(b) is to promote the finality of transactions potentially involving estate assets. *See, e.g., In re Boy Scouts of Am.*, 137 F.4th 126, 149-50 (3d. Cir. 2025). To the extent the Debtor exercises its unilateral discretion in orchestrating transactions involving parish assets absent notice and a hearing in this case, both the Debtor and the purchaser would risk post-transaction litigation concerning the validity of those transactions for reasons including those

6541747.1

17

asserted by the Committee in this adversary proceeding. *See, e.g.*, 11 U.S.C. § 549. Future developments in the bankruptcy case, including the extent to which the parishes are or should be entitled to relief through the Debtor's reorganization, could give rise to additional litigation or disputes surrounding these matters. Immediate bankruptcy court oversight of these transactions in the first instance would be a more efficient use of judicial resources and give effect to the purpose of § 363(b), instead of litigating the validity of these actions post-closing.

## CONCLUSION

Seek the City must be scrutinized by creditors and placed before this Court for approval. This request is not an inequitable result as it pertains to the business conduct of a Debtor on matters that the Debtor describes as a "dramatic" realignment of its business. Under the circumstances of this case, for the reasons described above, the Committee respectfully submits that the Court should grant a preliminary injunction preventing the Debtor and all persons acting in concert with the Debtor from taking any further actions to implement any of the following of the Debtor's Seek the City objectives without prior Bankruptcy Court authorization following notice and a hearing:

I.  closing, suppressing, merging, consolidating, or materially reorganizing any parish within the Archdiocese of Baltimore;

II.  selling, leasing, transferring, encumbering, or otherwise disposing of any real property or other material assets of any parish that is the subject of Seek the City, or authorizing any such disposition;

III.  distributing, transferring, disbursing, pledging, commingling, or otherwise using proceeds of any Seek the City related asset dispositions;

6541747.1

18

IV. implementing, enforcing, or amending any Seek the City-related policy that governs the disposition of assets or liabilities, or materially impacts revenues derived from parishes; and/or

V. taking any action that would frustrate, moot, or impair this Court's ability to grant effective relief concerning Seek the City, including accelerating transactions or altering governance or financial arrangements,

and for such other and further relief as the Court deems appropriate.

Date: March 27, 2026                                  Respectfully submitted,

/s/ Alan M. Grochal
Alan M. Grochal, Fed. Bar No.: 01447
Richard L. Costella, Fed. Bar No. 14095
Tydings & Rosenberg LLP
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
Tel: (410) 752-9772
Fax: (410) 727-5460
Email: rcostella@tydings.com
          agrochal@tydings.com

*Local Counsel to the Official Committee of Unsecured Creditors*

-and-

Edwin H. Caldie (MN # 388930)
Andrew J. Glasnovich (MN # 398366)
Christopher B. Sevedge (MO # 68383)
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile:  612-335-1657
Email: ed.caldie@stinson.com
          drew.glasnovich@stinson.com
          chris.sevedge@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*

6541747.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on March 27, 2026 a copy of the foregoing *Plaintiff's Motion for Preliminary Injunction* was sent via the Court's CM/ECF notification system to the following:

Blake D. Roth, Esquire: blake.roth@hklaw.com
Catherine K. Hopkin, Esquire: chopkin@yvslaw.com

 */s/ Alan M. Grochal*
Alan M. Grochal

6541747.1